A. John Pate (6303)
Gary D. E. Pierce (6312)
**PATE PIERCE & BAIRD, PC**
215 South State Street, Suite 550
Salt Lake City, Utah 84111
Telephone: (801) 530-0330
jpate@patepierce.com
gpierce@patepierce.com

Richard A. Maniskas
D. Seamus Kaskela
**SCHIFFRIN BARROWAY
TOPAZ & KESSLER, LLP**
280 King of Prussia Rd.
Radnor, PA 19087
Telephone: (610) 667-7706
rmaniskas@sbtklaw.com
skaskela@sbtklaw.com

Evan J. Smith
**BRODSKY & SMITH, LLC**
Two Bala Plaza, Suite 602
Bala Cynwyd, PA 19004
Telephone: (610) 667-6200
Facsimile: (610) 667-9029
esmith@brodsky-smith.com

*Attorneys for Plaintiff*

FILED
U.S. DISTRICT COURT

2007 APR -4 P 3: 43

DISTRICT OF UTAH

BY:_____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| GUERIN SENTER, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> USANA HEALTH SCIENCES INC., MYRON W. WENTZ, DAVID A. WENTZ, and GILBERT A. FULLER, <br><br> Defendants. | Judge Ted Stewart <br> DECK TYPE: Civil <br> DATE STAMP: 04/04/2007 @ 15:40:29 <br> CASE NUMBER: 2:07CV00214 TS <br><br> PROPOSED CLASS ACTION <br><br> JURY TRIAL DEMANDED |

Plaintiff, Guerin Senter ("Plaintiff"), alleges the following based upon the investigation by Plaintiff's counsel, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding USANA Health Sciences, Inc. ("USANA" or the "Company"), securities analysts' reports and advisories about the Company, and information readily available on the Internet, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a federal class action on behalf of purchasers of the common stock of USANA between July 18, 2006 and March 14, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     USANA develops and manufactures nutritionals, personal care, and weight management products that are sold directly to Preferred Customers and Associates throughout the United States, Canada, and the world.

3.     Prior to and throughout the Class Period, USANA represented to be a highly successful company with a history of record earnings and a solid business model. However, despite the misrepresentations made by the Company, on March 15, 2007, the Fraud Discovery Institute ("FDI") and *The Wall Street Journal* revealed to investors the underlying unsustainability of the Company's business model, and that the Company was perpetrating a pyramid scheme in an attempt to sell its products.

4.     Immediately following these detailed exposés, shares of the Company's stock declined $8.92, or 15 percent, to close on March 15, 2007 at $49.85 per share, on unusually

2

heavy trading volume. As subsequent adverse information about the Company surfaced, shares of the Company's stock declined even further.

5.     The Complaint alleges that, throughout the Class Period, Defendants failed to disclose material adverse facts about the Company's financial well-being, business relationships, and prospects. Specifically, Defendants failed to disclose or indicate the following: (1) that the Company's business model was unsustainable because it required the constant recruitment of new Associates due to a high level of attrition within the Company's sales force; (2) that the Company's multi-level marketing model operated as a pyramid scheme; (3) that the majority of the Company's Associates did not actually sell to consumers, but rather to other Company Associates; (4) that over 74 percent of the Company's Associates were failing within the first year of joining the Company; (5) that over 87 percent of the Company's Associates were losing money instead of receiving compensation for their sales efforts; (6) that the Company lacked adequate internal and financial controls; and (7) that, as a result of the foregoing, the Company's statements about its future business prospects and projections was lacking in a reasonable basis when made.

## JURISDICTION AND VENUE

6.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

7.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

8.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged

herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District. Additionally, the Company is incorporated and maintains its principal place of business in this District.

9.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

10.     Plaintiff, Guerin Senter, as set forth in the accompanying certification, incorporated by reference herein and attached as Exhibit A, purchased USANA common stock at artificially inflated prices during the Class Period and has been damaged thereby.

11.     Defendant USANA is a Utah corporation with its principal place of business located at 3838 West Parkway Boulevard, Salt Lake City, Utah.

12.     Defendant Myron W. Wentz ("M. Wentz") was, at all relevant times, the Company's Chief Executive Officer ("CEO").

13.     Defendant David A. Wentz ("D. Wentz") was, at all relevant times, the Company's President and a Company Director.

14.     Defendant Gilbert A. Fuller ("Fuller") was, at all relevant times, the Company's Chief Financial Officer ("CFO"), Chief Accounting Officer ("CAO"), and an Executive Vice President.

15.     Defendants M. Wentz, D. Wentz, and Fuller are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of

4

USANA's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  Each Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from the public, and that the positive representations which were being made were then materially false and misleading.   The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS
### Background

16.     USANA develops and manufactures nutritionals, personal care, and weight management products that are sold directly to Preferred Customers and Associates throughout the United States, Canada, and the world.  Prior to and throughout the Class Period, USANA represented to be a highly successful company with a history of record earnings and a solid business model.  However, during the Class Period, the Company failed to reveal material information to investors, the revelation of which would have allowed investors to view USANA in the proper investment light.

### Materially False and Misleading
### Statements Issued During the Class Period

17.     The Class Period begins on July 18, 2006.  On this day, USANA issued a press release entitled "USANA Reports 16th Consecutive Quarter of Record Net Sales; Q2 Net Sales

5

Reached $93.9 Million; EPS of $0.55 ($0.59 Excluding Equity-Based Compensation Expense)."

Therein, the Company, in relevant part, stated:

> USANA Health Sciences Inc. (NASDAQ: USNA) today announced record net sales for the fiscal second quarter of 2006 (ended July 1). Consolidated net sales in the second quarter of 2006 increased 14.5% to $93.9 million, compared with $82.0 million in the second quarter of the prior year. This is the highest level of quarterly sales recorded in the company's history. Net sales growth for the second quarter of 2006 was driven primarily by a 13.6% increase in the number of Active Associates, compared with the second quarter of the prior year.
>
> **Financial Performance**
>
> Earnings from operations in the second quarter of 2006 grew 4.1% to $15.4 million, or 16.4% of net sales, compared with $14.7 million, or 18.0% of net sales, in the second quarter of the prior year. Earnings from operations in the second quarter of 2006 were reduced by $1.2 million due to the required expensing of equity-based compensation. The company achieved net earnings in the second quarter of 2006 of $10.3 million, an increase of 8.4%, compared with net earnings of $9.5 million in the second quarter of the prior year. Excluding the expense of equity-based compensation, this increase in net earnings would have been 17.0%. Earnings per share in the second quarter of 2006 improved to $0.55 per share, an increase of 14.6%, compared with $0.48 per share in the second quarter of the prior year. Excluding the expense of equity-based compensation, this increase in earnings per share would have been 22.9%.
>
> * * *
>
> "We are pleased with our strong sales results which continue to be driven by our consistent growth of Active Associates," said Dave Wentz, president of USANA. "In North America, second quarter sales grew by 19%, compared with last year. We believe this growth in our most mature region reflects the continued interest in our products and the business opportunity that USANA offers its Associates. The engagement and effort of our Associate leaders in North America has been one of the driving forces behind this success. Additionally, interest in our low-glycemic, macro optimizer products remained strong and was a growth driver in the second quarter, as this product group reached 14.1% of product sales."

* * *

**Outlook**

* * *

"We are updating our full year guidance and issuing third quarter guidance, neither of which includes any sales from our planned new market," said Gilbert A. Fuller, executive vice president and chief financial officer. "Accordingly, we expect net sales in the third quarter of 2006 to be in the range of $94 million to $96 million, compared with $82.2 million in the third quarter of last year, a growth rate of 14% to 17%. We expect earnings per share in the third quarter of 2006 to be between $0.55 and $0.57, including the adjustment for expensing of equity-based compensation, a growth rate of 8% to 12%. Excluding the expensing of equity-based compensation, we expect earnings per share in the third quarter of 2006 to be between $0.60 and $0.62, a growth rate of 18% to 22%.

"For the full year 2006," continued Fuller, "excluding entry into a new market, we now believe that net sales growth will range between 15% and 17%, compared with 2005. Additionally, we expect earnings per share growth for the full year 2006 to be between 17% and 20%, excluding the impact of expensing equity-based compensation. We expect equity-based compensation to decrease our earnings per share for the full year 2006 by approximately $0.18. This earnings per share estimate also assumes a tax rate for 2006 of 34.8%, compared with the 33.7% tax rate for 2005. While we are disappointed that the opening of our new market has taken longer than planned, we are pleased with our ability to continue to generate strong growth in our existing markets. We continue to believe that we are well-positioned to capitalize on excellent long-term growth opportunities, both in new and existing markets," concluded Fuller.

18.     On August 8, 2006, USANA filed its Quarterly Report with the SEC on Form 10-

Q. The Company's Form 10-Q was signed by Defendant Fuller, and reaffirmed the Company's

financial results previously announced on July 18, 2006. Additionally, the Company, in relevant

part, stated:

> USANA Health Sciences, Inc. develops and manufactures high-quality nutritional, weight management, and personal care products. We market our products on the basis of high levels of

bioavailability, safety, and quality. We distribute our products through a network marketing system using independent distributors whom we refer to as "Associates." As of July 1, 2006, we had 142,000 active Associates worldwide. We also sell products directly to "Preferred Customers" who purchase products for personal use and are not permitted to resell or distribute the products. As of July 1, 2006, we had 75,000 active Preferred Customers worldwide. The majority of sales in the Direct Selling segment come from Associates. For the six months ended July 1, 2006, sales to Associates accounted for approximately 86% of net sales for the Direct Selling segment. For purposes of this report, we only count as active customers those Associates and Preferred Customers who have purchased product from USANA at any time during the most recent three-month period.

* * *

The increase in net sales from the Direct Selling segment in North America was 19.0% compared with the second quarter of 2005. On a constant currency basis, sales in this region improved 15.8% over the same period of the prior year. The growth in this region was largely driven by strong sales in the United States, the Company's largest and most mature market, and Canada. Mexico also contributed to the increase in this region by growing 11.8% over the same period of the prior year. The overall sales increase in this region during the second quarter was driven by a 16.9% increase in the number of active Associates.

19.    The Company's Form 10-Q filed with the SEC also contained Sarbanes-Oxley

required certifications, which stated:

I, [Myron W. Wentz, Chief Executive Officer / Gilbert A. Fuller, Chief Financial Officer] of USANA Health Sciences, Inc., certify that:

1.    I have reviewed this Quarterly Report on Form 10-Q of USANA Health Sciences, Inc. (the "Registrant");

2.    Based on my knowledge, this Quarterly Report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Quarterly Report;

8

3. Based on my knowledge, the financial statements, and other financial information included in this Quarterly Report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this Quarterly Report;

4. The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Registrant and have:

    a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this Quarterly Report is being prepared;

    b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this Quarterly Report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this Quarterly Report based on such evaluation; and

    d) disclosed in this Quarterly Report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5. The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit

committee of the Registrant's board of directors (or persons performing the equivalent functions):

a)    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the the [sic] Registrant's internal control over financial reporting.

* * *

The undersigned [Myron W. Wentz / Gilbert A. Fuller] hereby certifies that the Quarterly Report on Form 10-Q of USANA Health Sciences, Inc. for the quarter ended July 1, 2006 as filed August 8, 2006 with the Securities and Exchange Commission, fully complies with the requirements of Section 13(a) or 15(d) of The Securities Exchange Act of 1934 (15 U.S.C. 78m) and that the information contained in the Quarterly Report fairly presents, in all material respects, the financial condition and results of operations of USANA Health Sciences, Inc.

20.    On October 17, 2006, USANA issued a press release entitled "USANA Reports Strong 15.8% Year-Over-Year Third Quarter Sales Growth." Therein, the Company, in relevant part, stated:

USANA Health Sciences, Inc. (NASDAQ: USNA) today announced continued strong financial results for the fiscal third quarter of 2006 (ended September 30). Additionally, the Company announced that it has obtained a business license in Malaysia and plans to begin selling products there in the first quarter of 2007.

**Financial Performance**

Consolidated net sales in the third quarter of 2006 increased by 15.8% to $95.2 million, compared with $82.2 million in the third quarter of the prior year. This is the 17th consecutive quarter of record sales for the Company. Net sales growth for the third quarter of 2006 was driven primarily by a 14.2% increase in the number of active Associates, compared with the third quarter of the prior year.

10

Earnings from operations in the third quarter of 2006 grew by 7.7% to $15.7 million, or 16.5% of net sales, compared with $14.6 million, or 17.8% of net sales, in the third quarter of the prior year. Earnings from operations in the third quarter of 2006 were reduced by $1.3 million due to the required expensing of equity-based compensation. Net earnings in the third quarter of 2006 grew by 1.8% to $10.2 million, compared with net earnings of $10.0 million in the third quarter of the prior year. Excluding the expense of equity-based compensation, this increase in net earnings would have been 10.5%. Earnings per share in the third quarter of 2006 increased by 7.8% to $0.55 per share, compared with $0.51 per share in the third quarter of the prior year. Excluding the expense of equity-based compensation, earnings per share would have been $0.60, an increase of 17.6%.

"During the third quarter, we again achieved growth in sales, earnings, and Associates," said Dave Wentz, President of USANA. "We were pleased with the double-digit sales growth that we achieved in all of our markets, excluding Japan. We have maintained our commitment to supporting our Associates with excellent customer service, innovative business management tools, and science-based products, and we believe that this strategy will promote our growth in the future."

* * *

**Outlook**

Commenting on USANA's future expectations, Gilbert A. Fuller, the Company's Executive Vice President and Chief Financial Officer, said, "We expect net sales in the fourth quarter of 2006 to be in the range of $98 million to $100 million, compared with $86.9 million in the fourth quarter of last year, a growth rate of 13% to 15%. During the fourth quarter of 2006, we will be heavily promoting our featured coverage in Success from Home magazine with related contests and incentives. These promotions and incentives were introduced at our convention in mid-September and so far the feedback from our Associates has been very positive. Additionally, we expect to incur expenses related to opening Malaysia. Accordingly, we now believe earnings per share in the fourth quarter of 2006 to be between $0.56 and $0.58. Excluding the expense of equity-based compensation, we expect earnings per share in the fourth quarter of 2006 to be between $0.61 and $0.63, a growth rate of 13% to 17%.

"Looking ahead to 2007, we expect to grow both net sales and earnings per share between 15% and 17%. This earnings per share

estimate includes operations in Malaysia, the expense of equity-based compensation, and assumes a tax rate for 2007 of 37%, which is meaningfully higher than the 35% tax rate that we have incurred during most of 2006," Mr. Fuller concluded.

21.     On November 7, 2006, USANA filed its Quarterly Report with the SEC on Form 10-Q.  The Company's Form 10-Q was signed by Defendant Fuller, and reaffirmed the Company's financial results previously announced on October 17, 2006.  The Company's Form 10-Q also contained a Sarbanes-Oxley certification substantially similar to the certification contained in ¶ 19, *supra*.  Additionally, the Company, in relevant part, stated:

USANA Health Sciences, Inc. develops and manufactures high-quality nutritional, weight management, and personal care products. We market our products on the basis of high levels of bioavailability, safety, and quality. We distribute our products through a network marketing system using independent distributors whom we refer to as "Associates." As of September 30, 2006, we had approximately 145 thousand active Associates worldwide. We also sell products directly to "Preferred Customers," who purchase our products for personal use and are not permitted to resell or distribute the products. As of September 30, 2006, we had approximately 76 thousand active Preferred Customers worldwide. The majority of sales in the Direct Selling segment come from Associates. For the nine months ended September 30, 2006, sales to Associates accounted for approximately 86% of net sales for the Direct Selling segment. For purposes of this report, we only count as active customers those Associates and Preferred Customers who have purchased products from USANA at any time during the most recent three-month period.

* * *

Consolidated net sales for the quarter and nine months ended September 30, 2006 continued to improve over prior year results, increasing 15.8% for both the quarter and nine month period. Excluding the positive impact of foreign currency fluctuation, sales increased 14.7% and 14.9%, respectively, for the quarter and nine months ended September 30, 2006. Overall, sales growth can be attributed to an increase in the number of active Associates in most countries within the Direct Selling segment.

* * *

The Company's operations are distinguished by regions served and method of distribution employed. Two reportable business segments are recognized by the Company: Direct Selling and Contract Manufacturing. These operating segments are evaluated regularly by management in determining the allocation of resources and in assessing the performance of the Company. Management evaluates performance based on net sales and the amount of operating income or loss. Segment profit or loss is based on profit or loss from operations before income taxes. All intercompany transactions, intercompany profit, currency gains and losses, interest income and expense, and income taxes are excluded from the Company's determination of segment profit or loss.

**Direct Selling**

The Company's Direct Selling segment develops, manufactures, and distributes nutritional, weight management, and personal care products, and is the primary segment in which the Company operates. **Products are distributed through a network marketing system using independent distributors referred to as "Associates." Products are also sold directly to "Preferred Customers," who purchase products for personal use and are not permitted to resell or distribute the products.**

* * *

**Associate Incentives**

Expenses related to Associate incentives are incurred only by the Direct Selling segment and represent our most significant cost as a percentage of net sales for this segment. Associate incentives increased to 41.2% of net segment sales during the third quarter of 2006, compared with 40.4% for the third quarter of 2005. This increase in Associate incentives, relative to net segment sales, can be attributed to an increase in the amounts that we paid on contests and promotions during the current quarter.

In the fourth quarter of 2006, we expect Associate incentive expense to decrease as a percentage of net segment sales by as much as 100 basis points from current quarter results. We have anticipated this decrease because we expect the relative percentage of non-commissionable sales to increase due to our promotion and sale of the *Success from Home* magazine, a non-commissionable item.

13

For the foreseeable future we expect Associate incentives will continue to be approximately 41% of net segment sales. As we look for ways to increase sales through Associate activity, our Associate incentives as a percentage of net segment sales may fluctuate modestly.

22.     On January 10, 2007, USANA issued a press release entitled "USANA Provides

Preliminary Fourth Quarter 2006 Result; Record Fourth Quarter Net Sales and EPS to Exceed

Guidance." Therein, the Company, in relevant part, stated:

USANA Health Sciences, Inc. (NASDAQ:USNA) today provided preliminary financial results for its fourth quarter ended December 30, 2006. The company currently expects net sales for this period to be approximately $101 million, before the reclassification as described below. This exceeds management's prior guidance of $98 million to $100 million. Net sales after the reclassification are expected to be approximately $99.5 million, which represents the 18th consecutive quarter of record net sales. Earnings per share for the fourth quarter are expected to exceed management's previously announced guidance of $0.56 to $0.58. The company now anticipates that earnings per share will be in the range of $0.58 to $0.60 and are not affected by the reclassification as described below.

\* \* \*

"We are pleased that we have finished out 2006 with such strong results, which reflect the hard work and dedication of our Associates as well as the market's continued enthusiasm for our science-based products," said Dave Wentz, president of USANA. "Malaysia, one of the top 15 direct selling markets globally, should provide us with additional growth opportunities."

\* \* \*

**Updated 2006 Guidance**

Giving effect to the reclassification mentioned above, management now anticipates net sales for the full year 2006 to be approximately $374 million. Because the reclassification will not affect earnings per share, management expects earnings per share for the full year 2006 to be in the range of $2.18 to $2.20, which is above the guidance range that was provided on October 17, 2006.

14

23. On February 6, 2007, USANA issued a press release entitled "USANA Announces Record Fourth Quarter 2006 Financial Results; Net sales increased by 16.5% to $99.8 million; Earnings per share increased by 13.0% to $0.61 (20.4% excluding equity-based compensation); Company raises 2007 earnings per share guidance." Therein, the Company, in relevant part, stated:

> USANA Health Sciences, Inc. (NASDAQ: USNA) today announced record financial results for the fiscal fourth quarter and for the full-year 2006 (ended December 30).
>
> **Financial Performance**
>
> Consolidated net sales in the fourth quarter of 2006 increased by 16.5% to $99.8 million, compared with $85.6 million in the fourth quarter of the prior year. Excluding the positive impact of currency fluctuations, this sales increase would have been 15.0%. Net sales growth for the fourth quarter of 2006 resulted primarily from a 15.0% increase in the number of active Associates, compared with the fourth quarter of the prior year.
>
> Earnings from operations in the fourth quarter of 2006 grew by 8.3% to $16.7 million, or 16.8% of net sales, compared with $15.4 million, or 18.0% of net sales, in the fourth quarter of the prior year. Earnings from operations in the fourth quarter of 2006 were reduced by $1.3 million, due to the required expensing of equity-based compensation. Earnings per share in the fourth quarter of 2006 increased by 13.0% to $0.61 per share, compared with $0.54 per share in the fourth quarter of the prior year. Excluding the expense of equity-based compensation, earnings per share in the fourth quarter of 2006 would have been $0.65, an increase of 20.4%, compared with the fourth quarter of the prior year. Earnings per share in the fourth quarter of 2006 were impacted by an expected unfavorable tax ruling, resulting in a tax rate that was higher than anticipated, and by a favorable foreign exchange gain on capital that was returned to the Company from one of its foreign subsidiaries.
>
> "The fourth quarter marked the 18th consecutive quarter of record sales, driven by strong sales growth of 16.6% in North America and 19.9% in the Asia Pacific region," said Dave Wentz, President of USANA. "Our results demonstrate our ability to grow in both our mature markets and in our newer markets.

"The promotions that we offered during the fourth quarter, including those relating to Success from Home Magazine, were key elements of our strong performance in the quarter. We are optimistic that, as we continue to offer contests and promotions, we will consistently generate new Associate prospects throughout 2007."

* * *

**Outlook**

Commenting on USANA's future expectations, Gilbert A. Fuller, the Company's Executive Vice President and Chief Financial Officer, said, "We expect net sales in the first quarter of 2007 to be in the range of $103 million to $105 million, compared with $88.2 million in the first quarter of last year, a growth rate of between 17% and 19%. This sales guidance includes revenue from Malaysia, which opened for business on January 8, 2007. We believe that earnings per share in the first quarter of 2007 will be between $0.61 and $0.63, compared with $0.50 in the first quarter of last year, a growth rate of between 22% and 26%.

"As to our guidance for the full-year 2007, we continue to expect net sales to grow by 15% to 17% over 2006. Based on our current expectations, however, we are raising our full-year 2007 earnings per share guidance and now believe that earnings per share will grow by 17% to 20% over 2006. This earnings per share estimate includes an estimated tax rate of 36.5%, which is higher than our 35.3% tax rate for 2006," Mr. Fuller concluded.

24.     On March 8, 2007, USANA filed its 2006 Annual Report with the SEC on Form 10-K. The Company's Form 10-K was signed by Defendants M. Wentz, D. Wentz, and Fuller, and reaffirmed the Company's financial results previously announced on February 6, 2007. The Company's Form 10-K also contained Sarbanes-Oxley certifications substantially similar to the certifications contained in ¶ 19, *supra*. Additionally, the Company, in relevant part, stated:

**Network Marketing Regulation**

**Laws and regulations in each country in which we operate prevent the use of deceptive or fraudulent practices that have sometimes been inappropriately associated with legitimate direct selling and network marketing activities. These laws include anti-pyramiding, securities, lottery, referral selling, anti-**

16

fraud and business opportunity statutes, regulations, and court cases. **Illegal schemes, typically referred to as "pyramid," "chain distribution," or "endless chain" schemes, compensate participants primarily or solely for the introduction or enrollment of additional participants into the scheme.** Often these schemes are characterized by large up-front entry or sign-up fees, over-priced products of low value, little or no emphasis on the sale or use of products, high-pressure recruiting tactics, and claims of huge and quick financial rewards requiring little or no effort. **Generally these laws are directed at ensuring that product sales ultimately are made to consumers and that advancement within sales organizations is based on sales of the enterprise's products, rather than investments in the organizations or other non-retail sales related criteria or activity. Where required by law, we obtain regulatory approval of our network marketing system, or, where approval is not required or available, the favorable opinion of local counsel as to regulatory compliance.**

**In addition to federal regulation in the United States, each state has enacted its own "Little FTC Act" to regulate sales and advertising. Occasionally we receive requests to supply information regarding our network marketing plan to regulatory agencies. Although we have from time to time modified our network marketing system to comply with interpretations of various regulatory authorities, we believe that our network marketing program is in compliance with laws and regulations relating to network marketing activities in our current markets.** Nevertheless, we remain subject to the risk that, in one or more of our present or future markets, the marketing system or the conduct of certain Associates could be found not to be in compliance with applicable laws and regulations. Failure by an Associate or us to comply with these laws and regulations could have a material adverse effect on our business in a particular market or in general. Any or all of these factors could adversely affect the way we do business and could affect our ability to attract potential Associates or enter new markets. **In the United States, the FTC has been active in its enforcement efforts against both pyramid schemes and legitimate network marketing organizations with certain legally problematic components, having instituted several enforcement actions resulting in signed settlement agreements and payment of large fines. Although to our knowledge we have not been the target of an FTC investigation, there can be no assurance that the FTC will not investigate us in the future.** [Emphasis added.]

25.    Regarding the Company's distribution and marketing system, the Company's

Form 10-K, in relevant part, stated:

**Distribution and Marketing**

**We distribute products through a network marketing system, which is a form of person-to-person direct selling through a network of vertically organized independent distributors who purchase products at wholesale prices from the manufacturer and then make retail sales to consumers.** The emergence of readily available means of mass communication, such as personal computers, facsimiles, low-cost long distance telephone services, satellite conferencing and the Internet, has contributed to the rapid growth of network marketing. The concept of network marketing is based on the strength of personal recommendations that frequently come from friends, neighbors, relatives, and close acquaintances. We believe that network marketing is an effective way to distribute our products because it allows person-to-person product education, which is not as readily available through other distribution channels.

**A person who wishes to sell USANA products must join our independent sales force as an Associate. A person becomes an Associate by completing an application under the sponsorship of an existing Associate. The new Associate then becomes part of the sponsoring Associate's downline sales organization.** New Associates sign a written contract and agree to adhere to the USANA policies and procedures. **New Associates are also required to purchase a starter kit** that includes a detailed manual, including our policies and procedures.

* * *

**Associates cannot simply recruit others for the purpose of developing a downline and earn income passively, depending solely on the efforts of their downline. Each Associate is required to purchase a certain amount of product each month ("Qualifying Purchases"), which they must either resell to consumers or personally use, in order to be qualified to earn commissions or bonuses under USANA's Compensation Plan. Associates do not earn commissions on these Qualifying Purchases. The purpose of our Compensation Plan is to reward Associates for actively selling our products and for recruiting and retaining others to sell our products.** [Emphasis added.]

26.    Regarding the sustainability of the Company's business model, the Company's

Form 10-K, in relevant part, stated:

> **If the number or productivity of independent Associates does not increase, our revenue will not increase. To increase revenue, we must increase the number and/or the productivity of our Associates.** We can provide no assurances that the number of Associates will increase or remain constant, or that their productivity will increase. **We experienced a 29.5%, 16.7%, and 15.0% increase in active Associates during 2004, 2005, and 2006, respectively.**
>
> \* \* \*
>
> **Attract and Retain Associates and Preferred Customers**
>
> **We recognize the need to continue to attract and retain Associates.** We maintain emphasis on the partnership between the USANA management team and our Associate leaders. Through this partnership, our Associate leaders continue to host "Health & Freedom" meetings and online presentations, both aimed at presenting the business opportunity to potential Associates and providing additional training and resources for existing Associates. In addition to our Annual International Convention and our Asia Pacific Convention, we hold several regional events in key growth areas to provide support and training to new Associates in these areas. **We intend to continue growing our business by maintaining a focus on our two core values, "True Health" and "True Wealth." We plan to accomplish this by increasing the number of active Associates and teaching them how to build a strong customer base.** By leveraging the current growth we have in our Associate field, we believe we can continue to attract individuals that are interested in joining a winning team and starting a home-based business with USANA. [Emphasis added.]

27.    Regarding how the Company accounted for "active Associates," the Company's

Form 10-K, in relevant part, stated:

> As of December 30, 2006, we had 153,000 active Associates and 78,000 active Preferred Customers worldwide. For purposes of this report, we only count as active customers those Associates and Preferred Customers who have purchased product from USANA at any time during the most recent three-month period.

28.   Regarding the Company's compensation plan for its associates, the Company's

Form 10-K, in relevant part, stated:

**Attractive Associate Compensation Plan and Benefits**

We are committed to providing a highly competitive compensation plan to attract and retain Associates who constitute our sales force. We believe the USANA Associate compensation plan (the "Compensation Plan") is one of the most financially rewarding in the network marketing industry. **Associate incentives totaled $146.3 million, or 40.1% of net sales for the Direct Selling segment in 2006.** We pay Associate incentives weekly and our Compensation Plan is a global-seamless plan, meaning that Associates can be compensated each week for their business success in any market in which we conduct business. To support our Associates, we sponsor meetings and events throughout the year, which offer information about our products and our network marketing system. These meetings are designed to assist Associates in business development and to provide a forum for interaction with successful Associates and the USANA management team. We also provide low cost sales tools, which we believe are an integral part of building and maintaining a successful home-based business for Associates.

* * *

**The Compensation Plan provides several opportunities for Associates to earn compensation, provided they are willing to consistently work at building, training, and retaining their downline organizations to sell USANA products to consumers.** We believe this Compensation Plan is distinctive for its weekly distributions and equitable payouts, which are designed to create appropriate incentives for the sale of USANA products. **Associates cannot simply recruit others for the purpose of developing a downline and earn income passively, depending solely on the efforts of their downline. Each Associate is required to purchase a certain amount of product each month ("Qualifying Purchases"), which they must either resell to consumers or personally use, in order to be qualified to earn commissions or bonuses under USANA's Compensation Plan. Associates do not earn commissions on these Qualifying Purchases. The purpose of our Compensation Plan is to reward Associates for actively selling our products and for recruiting and retaining others to sell our products.** [Emphasis added.]

29.     Additionally, USANA sent a copy of its 2006 Annual Report to shareholders, and

included a letter to the shareholders signed by Defendants M. Wentz and D. Wentz.  This letter,

in relevant part, stated:

> **Our Associates – a cornerstone of our continued success**
>
> **USANA Associates, our single most valuable asset, are essential
> to our success. We ended 2006 with 153,000 active Associates,
> an increase of 15 percent from 133,000 Associates at the end of
> 2005.** The number of Preferred Customers also grew by 11.4
> percent. In addition to our world-class product lines, we also
> provide our Associates with the support they need to make
> growing their business as easy as possible. We offer superior
> customer service and straightforward Web-based sales and
> management programs, ranging from online product ordering to
> Website hosting. We also regularly create awardwinning [sic] sales
> tools that are affordable and easy to use. At the 2006 convention,
> we unveiled PresentationPro, a new software program designed to
> help Associates create polished and up-to-date sales presentations.
> **One of the convention's biggest announcements was our
> feature in the November 2006 issue of Success from Home.
> This national newsstand magazine dedicated the entire issue to
> USANA's products and home-based business opportunity, and
> Associates have had great success using it as a recruiting tool.**
>
> **The future – our next 15 years**
>
> In 2007 we will commemorate our 15th year as a world-class
> company. And while we have many past accomplishments to
> celebrate, our future looks even brighter. We will continue to
> expand into promising markets and develop new products.
> However, we know that it is the fundamentals that make USANA
> great – our focused business strategy, our sciencebased [sic]
> products, and our world-class Associates. In summary, we want to
> thank the thousands of USANA Associates and nearly 900
> employees worldwide who are tireless in their commitment to
> USANA and our long-term vision. With their dedication, we can
> look forward to our next 15 years of health and prosperity.
> [Emphasis added.]

30.     The statements contained in ¶¶ 17 – 29 were materially false and misleading when

made because Defendants failed to disclose or indicate the following: (1) that the Company's

business model was unsustainable because it required the constant recruitment of new Associates

due to a high level of attrition within the Company's sales force; (2) that the Company's multi-level marketing model operated as a pyramid scheme; (3) that the majority of the Company's Associates did not actually sell to consumers, but rather to other Company Associates; (4) that over 74 percent of the Company's Associates were failing within the first year of joining the Company; (5) that over 87 percent of the Company's Associates were losing money instead of receiving compensation for their sales efforts; (6) that the Company lacked adequate internal and financial controls; and (7) that, as a result of the foregoing, the Company's statements about its future business prospects and projections was lacking in a reasonable basis when made.

### The Truth Begins to Emerge

31.    On March 15, 2007, the Fraud Discovery Institute ("FDI") issued a press release entitled "Fraud Discovery Institute Issues Report on Public Company Usana Health Sciences, Inc. Documenting Multiple Alleged Misrepresentations, Material Non-Disclosures and an Untenable Business Model." Therein, the FDI, in relevant part, revealed:

> SAN DIEGO , CA – The Fraud Discovery Institute, under the direction of Barry Minkow, has issued a report on public company, Usana Health Sciences, Inc., **alerting authorities to possible fraud and also raising questions about the legitimacy of the entire multi-level marketing industry**. The Wall Street Journal reported the story today.
>
> Minkow's 500 page report, addressed to the FBI, SEC and IRS and now posted on www.frauddiscovery.net, **raises many serious concerns about Usana, including the company's alleged untenable business model whereby no less than 85% of current distributors are losing money and no less than 74% of distributors fail within the first year. Yet these distributors account for 86% of the company's multi-level marketing revenue.**
>
> **The report also documents another secret of the Usana business – specifically that only 3% of distributors receive 70% of company-paid commissions, which, in turn, skews the alleged "average income figure" for distributors posted on the company's web site.**

Minkow also attacked the very heart of the Usana business model by allegedly debunking the myth that manufacturer direct-to-distributor sales and purchases saves distributors and preferred Usana customers "75%" because it avoids the traditional method of retail sales with national, regional and local retail outlets marking up the cost of the item. However, by hiring two accredited, independent labs, the Fraud Discovery Institute appears to have demonstrated that Usana's best selling vitamin products are hopelessly overpriced and, in one example, were over 400% more expensive than a comparable over the counter health food store-bought product. "If this is the case, one would expect the company to struggle with reselling these products because of their huge markup. **The evidence appears to show just that, as only 14% of company revenues stem from retail sales."**

According to Minkow: "From 2003 to 2006 the company repurchased 3,881,000 in stock with cash from operations totaling 133,377,000, while insiders sold off over 95 million in exercised options. That, in itself, is not wrong, **but since the operating cash of the company to repurchase these shares came from the undisclosed attrition rates of collapsed distributors who had bought into the "True Wealth" dream of Usana, but instead lost money and went into further debt, the Usana management literally funded stock buy backs that enriched themselves from those failed distributors who could least afford to lose money. That is wrong, that is evil," Minkow said.**

**Moreover, while Wall Street analysts who follow Usana continue to recommend a strong buy for the stock, the Minkow report may demonstrate a material failure by many analysts to understand the 'below the iceberg' affects of the Usana numbers.** Says Minkow, "While many analysts point to things like EBITA and EPS, **they ignore – because they are purposely kept in the dark by Usana's failure to disclose material facts – critical factors such as the obvious: the largest portion of Usana's revenue comes from distributors who are in a constant state of collapse with 85% of these distributors losing money and no less than 74% failing within a 12 month time period, causing significant saturation challenges that will materially impact the company."**

**"If new distributors knew about failure and collapse rates, the inability to resell hopelessly overpriced products and that most of the money paid in commissions goes to the top 3% of the Usana distributors, Usana's ability to attract new distributors would be materially adversely affected, which appears to be why they have chosen not to disclose any of these facts.**

> There are also significant management credibility issues with Dr.
> Myron Wentz, the company Chairman and Founder and majority
> stock holder, who renounced his U.S. citizenship and
> misrepresented the location of the entity that controls 46% of
> Usana stock – it is in the tax-haven country of Liechtenstein.
> [Emphasis added.]

32.     Also on March 15, 2007, *The Wall Street Journal* carried an article entitled

"Usana Sales Plan Draws Fire From Felon Turned Gumshoe."   The article, in addition to

reporting on the contents of the FDI press release, in relevant part, further revealed:

> Usana Health Sciences Inc., a marketer of vitamins and nutritional
> supplements, has set sales records in every one of its last 18
> quarters while watching its stock price soar more than 1,600% over
> that time.
>
> * * *
>
> **Mr. Minkow is no ordinary gumshoe. After serving jail time in
> the 1990s for stock fraud in the ZZZZ Best debacle, he became
> a Christian pastor, founded a San Diego company that hunts
> for other potential frauds and has won praise from the Federal
> Bureau of Investigation.** He recently helped expose Pinnacle
> Development Partners, an Atlanta real-estate marketer whose
> founder has been indicted.
>
> Usana **Health Sciences ... uses at-home distributors, or
> "associates," to sell products, according to company
> documents and interviews. It arranges them in a hierarchy.
> One person is at the very top, two distributors sit below him,
> four below them, eight on the next level and so on. The
> company pays a distributor a commission of about 8% on sales
> made by those below him in the hierarchy, up to a certain
> limit.** But to be eligible for commissions, distributors must buy or
> refer to the company $116 in orders each month.
>
> Usana – which disagrees with Mr. Minkow's analysis of it – uses
> the recruitment slogan "True Health and True Wealth" and its Web
> site offers "high income potential." The company has said it holds
> 500 recruitment meetings a week around the country. **About 86%
> of Usana's revenue comes from sales to its 153,000 associates.
> Only 14% comes from sales to customers unaffiliated with the
> company. Last year, the company earned $41 million on sales
> of $374 million.**

\* \* \*

**Mr. Minkow says the company's sales model is unsustainable because it requires the constant recruitment of new associates. Eventually, he argues, the company will run out of distributors, who will face long odds selling products or recruiting new disciples**. Usana's major product, a multivitamin, is far more expensive than rivals.

**As of the end of 2005, only 37% of Usana's associates had ever earned a commission, according to the company's latest figures. Among those who had been paid, the figures show, 87% didn't earn enough to cover the $116 they have to purchase or refer each month to qualify for commissions.**

\* \* \*

Cole Chambers, of Broomfield, Colo., says he joined Usana looking for a "turn-key business." But after handing over $700 in sign-up and activation purchases, he couldn't resell anything or recruit anyone and eventually gave up. "I feel like the vitamins are so expensive," he said. Usana says people like Mr. Chambers can take advantage of its one-year, 90% refund for products returned by distributors who quit.

\* \* \*

Usana's price is also more than 20 times that of mass-market brands like Wyeth's Centrum. Mr. Minkow says **Usana looks like a pyramid scheme to him – a fraud that works like a chain-letter, in which each new recruit has to find new members in order to profit, until the available pool of recruits dries up.** [Emphasis added.]

33.     Upon the release of this news, shares of the Company's stock declined $8.92 per share, or 15 percent, to close on March 15, 2007 at $49.85 per share, on unusually heavy trading volume.

### Post Class Period Disclosures

34.     Almost immediately following the revelations about USANA by the FDI and *The Wall Street Journal*, the Company filed a lawsuit against Mr. Minkow and the FDI for defamation. While generally denying the contentions and statements made by Mr. Minkow and

the FDI, the Company did not provide any specific or concrete examples which would tend to refute Mr. Minkow's opinions.

35.    Then on March 19, 2007, USANA issued a press release entitled "USANA Voluntarily Discloses Informal SEC Inquiry; The Company Formally Requests That SEC Investigate Barry Minkow's Recent Statements in the Mass Media, Put Options in USANA Stock."  Therein, the Company, in relevant part, stated:

> USANA Health Sciences Inc. (NASDAQ:USNA) announced today that it has received notification from the U.S. Securities and Exchange Commission ("SEC"), Salt Lake District Office, that it has begun an informal inquiry regarding the Company. The Company believes the inquiry relates to assertions appearing in the mass media about USANA.  [Emphasis added.]

36.    The FDI continued its investigation of USANA, and on March 28, 2007, the FDI issued a press release entitled "Doubt Cast on Stated Credentials of Director of Usana Health Sciences Inc. (USNA); Company Recently Under Informal Investigation by S.E.C., Says Fraud Discovery Institute."  Therein, the FDI, in relevant part, revealed:

> **Usana Director and Official Spokesman Has a 'Secret'**
>
> An independent inquiry ordered by the Fraud Discovery Institute, Inc. (FDI) to look into the background of Denis E. Waitley, longtime director and spokesman of Usana Health Sciences Inc., could not confirm statements made on multiple, official S.E.C. filings about Mr. Waitley's educational credentials, it was announced by Barry Minkow and FDI today. Usana has made headlines in the last two weeks after coming under S.E.C. scrutiny following a 500-page report from FDI that was made public and a subsequent investigative cover story in the Money & Investing section of the Wall Street Journal (March 15).
>
> **According to Barry Minkow, independent licensed private investigators who specialize in examining resumes could not confirm that Mr. Waitley had earned a M.A. degree from the Naval Post Graduate School, in Monterey, California. Moreover, the Doctorate, or a Ph.D. in Human Behavior from La Jolla University listed in Mr. Waitley's resume, appears to have come from a now defunct and never-accredited "diploma**

26

mill," according to Minkow. Both alleged degrees are listed on official S.E.C. filings.

Mr. Waitley, a well-known motivational speaker who also appears in the hit movie, The Secret, is listed on Usana's Schedule 14A Proxy Statement, filed on March 13, 2007, as having "served as a director of USANA since May 2000. Dr. Waitley has also served as a consultant to and a spokesperson for USANA since September 1996." The Proxy also states, "Dr. Waitley received a B.S. from the U.S. Naval Academy at Annapolis, an M.A. in Organizational Development from the Naval Post Graduate School in Monterrey, California, and a Ph.D. in Human Behavior from La Jolla University."

The Fraud Discovery Institute, under the direction of Barry Minkow, contracted a licensed private investigator to assist in FDI's inquiry into this apparent resume inconsistency. After contacting the Naval Post Graduate School, he writes: "When contacted by our investigators, a representative of the school was unable to locate any record that the search subject graduated with the stated degree, and as such, it would appear that this assertion is untrue," the report says.

Regarding the Ph.D. from La Jolla University, the report also stated, "Finally, the subject is listed in the same government filings as having graduated with a Ph.D. from La Jolla University. No record of this school was found in our databases of current accredited institutions of higher-learning, and the school does not appear in the databases of the State of California Bureau for Private Post-Secondary & Vocational Education. Despite extensive database searches, no working telephone number was found for this school. Accordingly, it was not possible to verify that the search subject graduated with the stated degree from this institution."

"The significance of these findings are particularly relevant because of Mr. Waitley's apparent role as the Usana official spokesman and independent director," said Barry Minkow. "Moreover, according to public documents, Mr. Waitley has cashed out over $2,350,000 in exercised stock options in 2006 alone," Minkow added.

In other developments, the second segment of the FDI response to Usana has been posted on YouTube.com. In this segment, Barry Minkow brings a film crew to four vitamin stores and purchases numerous vitamin products to compare prices with Usana's top selling, Usana Health Pak 100(TM), which wholesales for $118.00

for a one-month supply. "There is no objective, rational person who can watch this segment and conclude that, compared to comparable vitamin packs sold in retail stores, that the Usana product offers the consumer with any savings whatsoever - but is actually hopelessly overpriced when compared with multiple products from different companies." [Emphasis added.]

37.     On March 30, 2007, USANA confirmed the FDI's findings in a press release

entitled "USANA Director Denis E. Waitley Withdraws Nomination for Reelection to the Board

of Directors." Therein, the Company stated:

USANA Health Sciences Inc. issued the following statement today regarding allegations made concerning the academic credentials of board member, Dr. Denis Waitley:

**"Dr. Denis Waitley has decided not to stand for reelection to the USANA board of directors. Dr. Waitley recently informed USANA that an error appeared in his biography listed in the Company's proxy statement and that he did not in fact earn a masters degree in Organizational Development from the Naval Post Graduate School in Monterey, California.** Dr. Waitley did confirm that he earned a Bachelor of Science degree from the United States Naval Academy in Annapolis, Maryland, and a Ph.D. in Human Behavior from La Jolla University. Dr. Waitley's board term will end on April 17, 2007, at which time he will retire as a director of the Company.

"The board of directors has regretfully acknowledged Denis Waitley's decision to retire from the board and acknowledges his contributions to USANA during his tenure as a director."

Commenting on Dr. Waitley's decision, Dr. Myron Wentz, chairman of USANA's board of directors, said, **"It is with regret that we accept Dr. Waitley's decision not to stand for reelection. We appreciate all that Denis has done to help build this great company. Denis's lifetime of accomplishments speak for themselves."** [Emphasis added.]

38.     Upon the release of this news, shares of the Company's stock declined an

additional $3.52 per share, or 7 percent, to close on March 30, 2007 at $46.87 per share, on

usually heavy trading volume.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

39.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the common stock of USANA between July 18, 2006 and March 14, 2007, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

40.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, USANA's common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by USANA or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

41.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

42.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

43.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the

questions of law and fact common to the Class are:

      (a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

      (b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of USANA; and

      (c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

44.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

45.     The market for USANA's common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, USANA's common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired USANA's common stock relying upon the integrity of the market price of USANA's common stock and market information relating to USANA, and have been damaged thereby.

46.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of USANA's common stock, by publicly issuing false and misleading

statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

47. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about USANA's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of USANA and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

48. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

49. During the Class Period, Plaintiff and the Class purchased common stock of USANA at artificially inflated prices and were damaged thereby. The price of USANA's common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

50.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding USANA their control over, and/or receipt and/or modification of USANA's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning USANA, participated in the fraudulent scheme alleged herein.

51.     Additionally, during the Class Period, and with the Company's stock trading at artificially inflated prices, Company insiders were able to sell 534,805 shares of Company stock for gross proceeds of $30,234,964, including $7,362,415 million in gross profit obtained by the Individual Defendants alone.  This inside trading is evidenced by the following chart:

| DATE | TRADER | NUMBER OF SHARES | PRICE PER SHARE | GROSS PROCEEDS |
|---|---|---|---|---|
| 3/1/07 | RICHARDSON, BRADFORD | 5,100 | $58.50 - $59.00 | $3,000,002 |
| 2/26/07 | GUEST, KEVIN | 7,255 | $61.00 | $442,555 |
| 2/20/07 | GUEST, KEVIN | 18,000 | $60.72 | $1,092,960 |
| 2/13/07 | MCCLAIN, JERRY G | 5,000 | $61.12 | $305,600 |
| 2/12/07 | GULL HOLDINGS LTD | 85,000 | $60.98 | $5,183,300 |
| 2/12/07 | WENTZ, MYRON W | 85,000 | $60.98 | $5,183,300 |
| 2/9/07 | WILSON, MARK H | 10,000 | $61.35 | $613,500 |
| 2/8/07 | POELMAN, RONALD S | 10,000 | $59.85 | $598,500 |

| 12/11/06 | MCCLAIN, JERRY G | 10,000 | $50.10 | $501,000 |
|----------|------------------|--------|--------|----------|
| 12/5/06 | RICHARDSON, BRADFORD | 5,000 | $49.23 | $246,149 |
| 11/27/06 | RICHARDSON, BRADFORD | 5,000 | $47.91 | $239,549 |
| 11/27/06 | WOOD, TIMOTHY E | 500 | $48.00 | $24,000 |
| 11/15/06 | RICHARDSON, BRADFORD | 10,000 | $45.12 | $451,200 |
| 11/15/06 | COOPER, FRED W | 5,000 | $45.95 | $229,750 |
| 11/7/06 | WOOD, TIMOTHY E | 9,000 | $44.03 | $396,270 |
| 11/6/06 | WOOD, TIMOTHY E | 26,250 | $43.74 | $1,148,175 |
| 11/3/06 | WAITLEY, DENIS E | 25,000 | $43.14 | $1,078,500 |
| 10/26/06 | WILSON, MARK H | 5,000 | $44.66 | $223,299 |
| 10/25/06 | WILSON, MARK H | 5,000 | $45.01 | $225,050 |
| 10/24/06 | WILSON, MARK H | 20,000 | $45.14 | $902,800 |
| 10/20/06 | IIEKKING, G DOUG | 20,000 | $45.00 | $900,000 |
| 10/20/06 | WILSON, MARK H | 30,000 | $44.86 | $1,345,800 |
| 10/19/06 | FULLER, GILBERT A | 33,700 | $44.95 | $1,514,815 |
| 9/15/06 | AUCIAUX, ROBERT | 3,000 | $45.64 | $136,920 |
| 9/1/06 | COOPER FRED W | 30,000 | $44.06 | $1,321,800 |
| 8/16/06 | RICHARDSON BRADFORD | 5,000 | $45.00 | $225,000 |
| 8/15/06 | WENTZ, DAVE | 5,000 | $44.76 | $223,800 |
| 8/14/06 | WENTZ, DAVE | 5,000 | $44.35 | $221,750 |
| 8/9/06 | MCCLAIN, JERRY G | 2,000 | $44.61 | $89,220 |
| 7/28/06 | WENTZ, DAVE | 5,000 | $43.75 | $218,750 |
| 7/28/06 | WAITLEY, DENIS E | 30,000 | $43.75 | $1,312,500 |
| 7/27/06 | WENTZ, DAVE | 5,000 | $43.83 | $219,150 |
| 7/25/06 | GUEST, KEVIN | 10,000 | $42.00 | $420,000 |
| **TOTALS:** | | **534,805 Shares** | | **$30,234,964 Gross Proceeds** |

## Applicability of Presumption of Reliance:
## Fraud On The Market Doctrine

52.     At all relevant times, the market for USANA's common stock was an efficient market for the following reasons, among others:

        (a)     USANA's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

        (b)     As a regulated issuer, USANA filed periodic public reports with the SEC and NASDAQ;

        (c)     USANA regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

        (d)     USANA was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

53.     As a result of the foregoing, the market for USANA's common stock promptly digested current information regarding USANA from all publicly-available sources and reflected such information in USANA's stock price. Under these circumstances, all purchasers of USANA common stock during the Class Period suffered similar injury through their purchase of USANA common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

54.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of USANA who knew that those statements were false when made.

### FIRST CLAIM
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

55.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

56.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase USANA common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

57.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for USANA's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

58.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of USANA as specified herein.

59.     These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of USANA's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about USANA and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of USANA common stock during the Class Period.

60. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

61. The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing USANA's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

62.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of USANA common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of USANA's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired USANA's common stock during the Class Period at artificially high prices and were damaged thereby.

63.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that USANA was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their USANA common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

64.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

65.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## SECOND CLAIM
### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendants

66.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

67.    The Individual Defendants acted as controlling persons of USANA within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

68.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

69.    As set forth above, USANA and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of

the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED on this ___4th___ day of April, 2007.

Respectfully submitted,

A. John Pate (6303)
Gary D.E. Pierce (6312)
**PATE PIERCE & BAIRD, PC**
215 South State Street, Suite 550
Salt Lake City, Utah 84111
(801) 530-0330
(801) 530-5955
jpate@patepierce.com
gpierce@patepierce.com

Richard A. Maniskas
D. Seamus Kaskela
**SCHIFFRIN BARROWAY**
**TOPAZ & KESSLER, LLP**
280 King of Prussia Rd.
Radnor, PA 19087
(610) 667-7706
(610) 667-7056 (fax)
rmaniskas@sbtklaw.com
skaskela@sbtklaw.com

Evan J. Smith
**BRODSKY & SMITH, LLC**
Two Bala Plaza, Suite 602
Bala Cynwyd, PA 19004
(610) 667-6200
(610) 667-9029 (fax)
esmith@brodsky-smith.com

*Attorneys for Plaintiff*

%JS 44  (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

GUERIN SENTER, Individually and On Behalf of All Others Similarly Situated,

**DEFENDANTS**

USANA HEALTH SCIENCES INC., MYRON W. WENTZ, DAVID A. WENTZ, and GILBERT A. FULLER

FILED

**(b)** County of Residence of First Listed Plaintiff  Clark County
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  Salt Lake
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED. 2007 APR -4 P 3: 42

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Pate Pierce & Baird, 215 South State Street, Suite 550, Salt Lake City, Utah  84111

Attorneys (If Known)

DISTRICT OF UTAH

BY:_____

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☒ 3  Federal Question (U.S. Government Not a Party) |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☒ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

| | | | | | | | Appeal to District Judge from Magistrate Judgment |
|---|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 | |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. 78j(b)and 78t(a)and 17 C.F.R. 240.10b-5

Brief description of cause:
Violations of federal securities laws and material misrepresentations

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):  JUDGE  Kimball   DOCKET NUMBER  2:07-cv-00177-DAK

DATE  April 4, 2007

SIGNATURE OF ATTORNEY OF RECORD  *Gary P.E. Pierce*    Gary D.E. Pierce (6312)

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____

**Judge Ted Stewart**
**DECK TYPE: Civil**
**DATE STAMP: 04/04/2007 @ 15:40:29**
**CASE NUMBER: 2:07CV00214 TS**

# EXHIBIT A

## PLAINTIFF'S CERTIFICATION

I, (Mr./Ms.) GUERIN SENTER _____, ("Plaintiff") declare under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.  Plaintiff has reviewed the complaint and authorized the commencement of an action on Plaintiff's behalf.

2.  Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.  Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff's transactions in ____USANA____ of securities during the Class Period specified in the Complaint are as follows (use additional sheet if necessary):

| Date | # of Shares Purchased | # of Shares Sold | Price |
|------|----------------------|------------------|-------|
| 2/12/02 | 100 – USANA | 100 | 6130.98 |
| 3/15/07 | | 100 | 5317.85 |

5.  During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws. [Or, Plaintiff has served as a class representative in the action(s) listed as follows:]

6.  Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 30 day of March, 2007

Sign Name: _____

Print Name: GUERIN SENTER